IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH S. HAZELL, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | NO. 02-2866 |
| | : | |
| v. | : | |
| | : | |
| BP PRODUCTS NORTH AMERICA INC., | : | |
| | : | |
| Defendant | : | |

## O R D E R

AND NOW, this _____ day of _____, 2003, upon consideration of plaintiff's Motion for Leave to Amend Complaint and defendant's response thereto, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

_____

Bartle, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH S. HAZELL, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | NO. 02-2866 |
| | : | |
| v. | : | |
| | : | |
| BP PRODUCTS NORTH AMERICA | : | |
| INC., | : | |
| | : | |
| Defendant | : | |

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
### TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT

Defendant BP Products North America, Inc. ("BP") opposes plaintiff's Motion for Leave

to Amend Complaint to add a claim of retaliation for opposing race discrimination in

employment. It is BP's position that the amendment would be futile because (1) the claim the

plaintiff proposes to add is time-barred; (2) the facts asserted as the basis of the amended

complaint do not state a claim for retaliation; and (3) the plaintiff's right-to-sue letter on his

retaliation claim is invalid.


**I.      PRELIMINARY STATEMENT**

Plaintiff Joseph S. Hazell was a gas station manager for BP from January to August 2001.

BP terminated him on August 13, 2001, for reasons associated with his management of his

station. Hazell filed a Charge of racial and national origin discrimination with the Equal

Employment Opportunity Commission ("EEOC") against BP in October 2001. After receiving

888018v1

the EEOC's right-to-sue letter on this Charge, plaintiff filed a Complaint with this Court on May 14, 2002, in which he alleged the same claim of racial and national origin discrimination.

Absent from both the EEOC Charge and the Complaint in this Court is a claim for retaliation. On January 6, 2003, sixteen months after his cause of action arose, Hazell filed a second EEOC Charge – alleging that he was the victim of unlawful retaliation – and requested an immediate right-to-sue notice. The EEOC issued a second right-to-sue notice on February 6, 2003. Plaintiff now asks this Court – only two months prior to the start of trial in this matter – for leave to amend his Complaint to allege retaliation.

Plaintiff bases his retaliation claim on a comment he allegedly made to the BP Human Resources Advisor, Miechelle Bertot, in July 2001, to the effect that his supervisor Paul Miller needed "racial sensitivity training." Plaintiff alleges that Bertot relayed this statement to Miller's boss, Operations Manager Steve Vandenbrook. Vandenbrook and John Sommer, Hazell's boss, terminated Hazell at his station on August 13. Miller was not involved in the termination.[1]

This Court should deny plaintiff's Motion for Leave to Amend Complaint. First, the retaliation claim is time-barred. Plaintiff contends that the alleged retaliation occurred in August 2001. He failed to notify the EEOC of such an allegation, however, until January 2003 – more than 300 days after the allegedly retaliatory conduct took place. (*See* plaintiff's letter to the EEOC, attached at Exhibit C.) Plaintiff is barred from bringing an untimely retaliation claim.

The doctrine of equitable tolling does not excuse plaintiff's untimeliness. Plaintiff's contention that he "only recently learned" of a potential retaliation claim because "Defendant

---

[1] It should be noted that Hazell mischaracterizes the record with respect to his statement to Bertot. Although Hazell testified that he cited "racial sensitivity training," the company witnesses do not agree. Contrary to plaintiff's assertion to this Court, the deposition testimony of Bertot and Vandenbrook is that Hazell said that Miller needed sensitivity training, not *racial* sensitivity training. (*See* Bertot's Dep. Tran., attached at Exhibit A, at 174-75 & Vandenbrook's Dep. Tran., attached at Exhibit B, at 170.)

actively misled [him] regarding the identity of the decision-makers in his termination," (Pl.'s

Mot. at 1.), is simply not true, as demonstrated by the undisputed record in this case. Plaintiff

was aware, before he filed his EEOC Charge in October 2001, of the facts that he now contends

support his claim of retaliation. Since July 2001, plaintiff has known about the statement he

allegedly made to Bertot. Plaintiff also has known that Steve Vandenbrook was present at and

participated in his termination. Contrary to plaintiff's assertion that BP's EEOC Position

Statement concealed Vandenbrook's involvement, the Position Statement actually describes

Vandenbrook's role, stating: "Mr. Hazell was informed that he was being terminated, *with Mr.

Vandenbrook's concurrence.*" (*See* defendant's Position Statement, attached at Exhibit D, at 3)

(emphasis added). Because there is no basis for the contention that defendant actively misled

plaintiff as to Vandenbrook's participation, plaintiff's retaliation claim is not entitled to equitable

tolling.

Second, plaintiff's allegations, even if true, are insufficient as a matter of law to establish

a claim of retaliation, as plaintiff did not engage in a protected activity. Plaintiff contends only

that he told Bertot that Miller needed "racial sensitivity training." Plaintiff acknowledges that he

never provided Bertot with any details surrounding this comment, and plaintiff does not allege

that he *ever* mentioned to Bertot – or any BP manager for that matter – that there was

discriminatory conduct on the part of Miller or any other BP employee. A vague statement about

sensitivity training falls short of "protected activity" within the meaning of the retaliation

provisions of Title VII.

Third, the right-to-sue letter recently issued by the EEOC on plaintiff's retaliation charge

is invalid. On January 6, 2003, plaintiff requested that the EEOC issue an "immediate right to

sue letter." (*See* plaintiff's letter to the EEOC, attached at Exhibit C.) The EEOC issued such a

letter weeks later, without requesting any information from defendant on this charge and without even the pretense of an investigation. (*See* Notice of Right to Sue, attached at Exhibit E.) This right-to-sue letter fails to satisfy the two purposes underlying Title VII and the administrative process – investigation and conciliation. Thus, the letter is invalid and should not be deemed by this Court to satisfy the statutory requirement of exhaustion of administrative remedies.

Accordingly, this Court should deny plaintiff's Motion for Leave to Amend Complaint.

## II.    STANDARD FOR DECIDING A MOTION TO AMEND THE COMPLAINT

This Court has the discretion to grant or deny a party's request for leave to amend a complaint. *See* Fed. R. Civ. P. 15; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). A court should deny such a request, however, when the proposed amendment is futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory*, 114 F.3d at 1434 (stating that undue delay, bad faith, dilatory motive, prejudice, and futility are among the reasons to deny leave to amend).

According to the United States Court of Appeals for the Third Circuit, an amended complaint is futile – and thus leave to amend should be denied – if the amendment would fail to state a claim upon which relief can be granted. *See In re Burlington Coat Factory*, 114 F.3d at 1434; *see also Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984) (concluding that a court may refuse to allow an amendment that fails to state a cause of action because it would not withstand a motion to dismiss).

888018v1

III.    **ARGUMENT**

This Court should deny plaintiff's Motion for Leave to Amend Complaint, as the

Amended Complaint would be futile.

A.    **Plaintiff's Retaliation Claim Fails Because It Is Time-Barred.**

Plaintiff's retaliation claim would not survive a motion to dismiss because the claim is

time-barred and is not subject to equitable tolling.  Thus, an Amended Complaint alleging such a

claim is futile.

It is well settled that as a condition precedent to filing suit under Title VII in

Pennsylvania, a plaintiff must first file charges with the EEOC within 300 days of the alleged

discriminatory act.  *See Amtrak v. Morgan*, 563 U.S. 101, 121 (2002); *see also* 42 U.S.C. §

2000e-5(e).  In certain circumstances, courts are permitted to equitably toll this filing

requirement when there has been a failure to file.  *See Robinson v. Dalton,* 107 F.3d 1018, 1021

(3d Cir. 1997); *Oshiver v. Levin*, 38 F.3d 1380, 1387 (3d Cir. 1994).

The United States Court of Appeals for the Third Circuit, however, has limited the

application of equitable tolling in employment discrimination cases to situations where (1) the

defendant actively misled the plaintiff respecting the plaintiff's cause of action; (2) the plaintiff

in some extraordinary way was prevented from asserting his or her rights; or (3) the plaintiff

timely asserted his or her rights mistakenly in the wrong forum.  *See Oshiver*, 38 F.3d at 1387;

*see also Galvis v. HGO Servs.,* 49 F. Supp.2d 445, 448 (E.D. Pa. 1999).[2]

The Third Circuit has further explained that to justify tolling, a plaintiff must show that

because of the defendant's deception, he could not have discovered, through the exercise of

---

[2] If these elements are shown, "the equitable tolling doctrine tolls the initial running of the statutory period until the
plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action."
*Galvis*, 49 F. Supp.2d at 448.

888018v1

reasonable diligence, the essential information bearing on his claim. *See Oshiver,* 38 F.3d at 1390 ("The plaintiff who fails to exercise this reasonable diligence . . . loses the benefit of" the equitable tolling doctrine.); *see also New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1125-26 (3d Cir. 1997) (stating that "excusable neglect" is "not sufficient to invoke equitable tolling").

Courts have refused to apply the doctrine of equitable tolling in cases in which there was no active deception on the part of the defendant. *See, e.g., Okokuro v. Commonwealth of Pennsylvania Dep't of Welfare,* Civ. No. 00-2044, 2001 U.S. Dist. LEXIS 1939, at *11 (E.D. Pa. Feb. 26, 2001); *Harper v. Court of Common Pleas of Philadelphia,* Civ. No. 99-4906, 2000 U.S. Dist. LEXIS 7252, at *14 (E.D. Pa. May 26, 2000); *Koschoff v. Henderson,* Civ. No. 98-2736, 1999 U.S. Dist. LEXIS 16184, at *23-24 (E.D. Pa. Oct. 7, 1999). The plaintiff in *Harper,* for instance, alleged that her Title VII claim should be equitably tolled because the defendants actively misled her by providing a false reason as to why she was not promoted. *Harper,* 2000 U.S. Dist. LEXIS 7252, at *14. The court disagreed, however, and instead found that the plaintiff did "not assert or present any evidence that she did not or could not" have discovered within the statute of limitations period. *Id.* The *Harper* court therefore dismissed the plaintiff's retaliation claim on the ground that it was time-barred. *Id.*

Similarly, the court dismissed the plaintiff's Title VII claim in *Koschoff,* holding that the claim was not entitled to equitable tolling because there was "no evidence that her supervisors actively misled her." *Koschoff,* 1999 U.S. Dist. LEXIS 16184, at *23. The court concluded that although the plaintiff's supervisor "told her it would be beneficial to her job if she dropped the complaint," it found that this statement could not be "characterized as a deceptive act that would have caused plaintiff's non-compliance," and thus, the statement was not sufficient to toll the

6

filing requirements. *Id.*; *see also Okokuro,* 2001 U.S. Dist. LEXIS 1939, at *11 (finding that the defendant's statement to the plaintiff that he would "regret pursuing his claim" did "not amount to the kind of extraordinary prevention that would justify reviving [his] claims against the defendants").

Joseph Hazell is not entitled to equitable tolling. Hazell knew – prior to his termination – that he had made a statement to Bertot concerning Paul Miller's need for sensitivity training. Thus, Hazell was aware of the activity that he now contends was protected. He obviously knew he had suffered an injury – he was fired from his job. Consequently, he was on notice of a potential retaliation claim when he filed his EEOC Charge in October 2001. He simply sat on his rights.

Hazell now seeks to justify his inaction on the unsupportable ground that BP misled him in its statements to the EEOC. This contention is unsupported in the record. John Sommer and his superior Steve Vandenbrook were the managers who told Hazell he was being terminated. BP told the EEOC in its Position Statement that both John Sommer and Steve Vandenbrook were involved in the decision and the basis for the decision. (*See* Exhibit D at 3.) This is consistent with the deposition testimony of John Sommer and Steve Vandenbrook in this case. (*See* Exhibit B at 166.) Plaintiff's assertion in the proposed amended complaint that he only recently learned that the Human Resources representative, Bertot, was involved in this decision is disingenuous at best. Hazell was a manager who must have known, or would have known had he exercised reasonable diligence, that Human Resources representatives deal in employment matters, including termination. Presumably that explains why Hazell mentioned his perceptions of Miller's shortcomings to Bertot in the first place. Moreover, defendant explicitly stated in its

7

Position Statement that "Mr. Hazell's termination was reviewed by Human Resources." (*See* Exhibit D, at 4.)

Hazell does not have the option under Title VII of waiting until discovery is almost over before he files his EEOC Charge. If he is reasonably on notice of a possible claim, he must take it to the EEOC within 300 days or lose it.

This Court should conclude that plaintiff's claim of retaliation is time-barred, and should deny his Motion for Leave to Amend on the basis of futility.

**B.      Plaintiff's Retaliation Claim Fails Because Plaintiff Did Not Engage in a Protected Activity.**

Even if plaintiff's retaliation claim were timely, it should still be dismissed because the statement he claims to have made is not a "protected activity" under Title VII.

To establish a claim of unlawful retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the defendant took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action. *See Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001).

Protected activity under Title VII consists of opposition to conduct that is statutorily prohibited or participation in an investigation or proceeding regarding such conduct. 42 U.S.C. § 2000e-3(a); *see also Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995). Protected activity also includes informal protests of discriminatory employment practices. *See Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). To qualify as a protected activity under Title VII, however, the employee's opposition must concern some discriminatory employment practice, and must not merely be an expression of dissatisfaction

888018v1

about working conditions or general social commentary. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 n.4 (3d Cir. 1997); *Barber*, 68 F.3d at 701-02.

The United States Court of Appeals for the Third Circuit, in *Barber*, held that the plaintiff's letter to the defendant's Department of Human Resources did not constitute protected conduct because the letter failed to allege a discriminatory employment practice. *Barber*, 68 F.3d at 702. The letter in *Barber* questioned the Department's decision to award a job position to another individual, rather than the plaintiff. *Id.* at 697. The plaintiff stated, in his letter, that he had 14 years experience and that he was "puzzled as to why the position was awarded to a less qualified individual." *Id.* Shortly after the plaintiff submitted this letter, the defendant eliminated his job position with the company. *Id.*

The plaintiff in *Barber* subsequently filed a Complaint in this Court, alleging, *inter alia*, that the defendant retaliated against him, in violation of the Age Discrimination in Employment Act ("ADEA"), for writing a letter of complaint.[3] *Id.* at 701. The district court, however, concluded that the plaintiff "did not demonstrate that he engaged in protected activity" and, therefore, granted the defendants' motion for judgment as a matter of law on the plaintiff's retaliation claim. *Id.*

The Third Circuit affirmed the district court's decision on appeal. *Id.* at 702. In its ruling, the Third Circuit concluded that the plaintiff's "letter [was] just too vague to support a finding that [the plaintiff's] job was eliminated because he engaged in [protected] behavior." *Id.* The court also stated that the plaintiff's letter failed to qualify as protected activity because it did not oppose any kind of discrimination, and thus, the plaintiff could not sustain a claim of retaliation. *Id.*; *see also Hampton v. Tokai Fin. Servs.*, Civ. No. 98-5074, 1999 U.S. Dist. LEXIS

---

[3] A retaliation claim under the ADEA consists of the same requisite elements as a retaliation claim alleged under Title VII. *See Barber*, 68 F.3d at 701.

1562, at *5 (E.D. Pa. Feb. 18, 1999) (dismissing plaintiff's retaliation claim under Title VII because plaintiff did not "allege[ ] that she acted to oppose any discriminatory practice or engaged any investigation of or proceeding regarding such a practice").

The United States Court of Appeals for the Eighth Circuit reached a similar conclusion when the plaintiff alleged a claim of retaliation in *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98 (8th Cir. 1995). The plaintiff, who was a teacher for the defendant school, based his retaliation claim on statements he made at a staff meeting that the principal's "efforts to comply with a desegregation directive disregarded the needs of the black student population" and that the principal had made "racially insensitive remarks." *Id.* at 101. Subsequent to these comments, the defendant chose not to renew the plaintiff's teaching contract. *Id.* at 100. The Eighth Circuit concluded that the plaintiff's statements were not protected activity under Title VII because they did not "relat[e] to the terms and conditions of [the plaintiff's] employment" and thus did not concern any discriminatory employment practice. *Id.* Accordingly, the circuit court held that the plaintiff in *Evans* could not succeed on his claim of retaliation. *Id.* (citing *Jamil v. Sec'y of Defense*, 901 F.2d 1203, 1207 (4th Cir. 1990) (concluding that a plaintiff's opposition is not protected under Title VII if it does not relate to his employer's employment practice)).

Here, plaintiff contends that defendant retaliated against him because of a comment he allegedly made to Miechelle Bertot, of the human resources department. As in *Barber* and *Evans*, however, Hazell's comment did not concern an unlawful employment practice. Hazell's alleged statement was that Paul Miller needed racial sensitivity training. He did not explain this comment, or say whether Miller's insensitivity related to dealings with customers of the gas stations, or employees of the gas station, or vendors of the gas station. The comment to Bertot was not about the conditions or terms of Hazell's employment. Thus, based on *Barber* and

10

*Evans,* this Court should find that plaintiff's comment did not concern an unlawful employment practice and is simply "too vague" to qualify as a protected activity.

Accordingly, plaintiff fails to state a cognizable claim of retaliation under Title VII, and the Court should deny plaintiff leave to amend.

### C.   Plaintiff's Right-To-Sue Letter Is Invalid.

Lastly, plaintiff's retaliation claim fails because the EEOC's right-to-sue letter on this charge is invalid.

After filing a charge with the EEOC, an individual must wait 180 days before bringing suit in federal court. Congress set forth such a requirement so that the purposes underlying the administrative process could be achieved: "to investigate individual charges of discrimination" and "to settle disputes through conference, conciliation, and persuasion before the aggrieved party [is] permitted to file a lawsuit." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974); *see also* 42 U.S.C. § 2000e-5(f)(1). Thus, if a plaintiff requests that the EEOC forego the 180-day waiting period, he is "preventing the EEOC from even attempting to accomplish, much less actually accomplishing, its congressionally-mandated purpose and is thwarting the policy underlying [sic] the enactment of Title VII." *Kozlowski v. Extendicare Health Servs., Inc.*, Civ. No. 99-4338, 2000 U.S. Dist. LEXIS 1493, at *5-6 (E.D. Pa. Feb. 17, 2000) (citation and internal marks omitted).

Based on this reasoning, courts have refused to allow a plaintiff to proceed on his Title VII claims when the plaintiff has failed to wait the 180 days before filing suit. *See, e.g., Kozlowski*, 2000 U.S. Dist. LEXIS 1493, at *6; *McLaughlin v. State Sys. of Higher Educ.*, Civ. No. 97-CV-1144, 1999 U.S. Dist. LEXIS 4325, at *6 (E.D. Pa. Mar. 31, 1999); *Robinson v. Red Rose Communs., Inc.*, Civ. No. 97-CV-6497, at *3 (E.D. Pa. May 5, 1998); *see also Moteles v.*

*Univ. of Pennsylvania*, 730 F.2d 913 (3d Cir. 1984) (expressing, in dicta, preference for exhaustion of administrative procedures prior to filing suit); *Pearce v. Barry Sable Diamonds*, 912 F. Supp. 149 (E.D. Pa. 1996) (questioning the validity of the EEOC's "early right-to-sue letter").

Plaintiff in this case requested, on January 6, 2003, that the EEOC issue an "immediate right to sue letter" on his charge of retaliation. (*See* plaintiff's letter to the EEOC, attached at Exhibit A.) On February 6, 2003, without even the pretense of an investigation, the EEOC issued such a letter. (*See* Notice of Right to Sue, attached at Exhibit E.) The EEOC did not even send a copy of the Charge to BP. Allowing plaintiff to now proceed on his retaliation claim would "emasculate[ ] Congressional intent [of Title VII] by short circuiting [sic] the twin objections of investigation and conciliation." *McLaughlin*, 1998 U.S. Dist. LEXIS 6506, at *3; *see also* 42 U.S.C. § 2000e-5b.

Accordingly, the Court should deny plaintiff's Motion for Leave to Amend.

IV.    **CONCLUSION**

The plaintiff's retaliation claim is untimely, is not based on a protected activity, and is

not authorized by a valid EEOC right-to-sue notice.  Therefore, defendant BP Products North

America Inc. requests that this Court deny plaintiff's Motion for Leave to Amend Complaint.


Respectfully submitted,


*Beth A. Friel*

Edward T. Ellis (I.D. No. 23680)
Janice G. Dubler (I.D. No. 76578)
Beth A. Friel (I.D. No. 86548)
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109-1099

Mary L. Casey, *admitted pro hac vice*

Attorneys for Defendant
BP Products North America Inc.

Dated: February 18, 2003

888018v1

## CERTIFICATE OF SERVICE

I, Beth A. Friel, counsel for defendant BP Products North America Inc. hereby certify that I caused a copy of defendant's Memorandum of Law in Opposition to plaintiff's Motion to Amend Complaint to be served by first class U.S. mail, postage prepaid, upon the person, at the addresses and on the date that appears below:

> Dena Calo, Esquire
> Gallagher, Schoenfeld,
>    Surkin & Chupein
> 25 West Second Street
> P. O. Box 900
> Media, PA 19063
>
> Attorney for Plaintiff

Date:   February 18, 2003

_____
Beth A. Friel

888018v1

RECYCLED

**Page 169**

(1) Avenue once Mr. Hazell was terminated, correct?
(2) A. That's correct.
(3) Q. Did he stay at that location until March,
(4) 2002?
(5) A. I believe so, yes.
(6) (Brief recess.)
(7) BY MS. CALO:
(8) Q. Is there anywhere that you have documented
(9) when you first saw a copy of Mr. Hazell's
(10) discrimination charge?
(11) A. No.
(12) Q. Have you ever been informed by any source
(13) that John Sommer was telling his site managers
(14) that they could not speak with Joseph Hazell?
(15) A. No.
(16) Q. Were you ever informed through any source
(17) that John Sommer was telling CSRs that they could
(18) not speak with Joseph Hazell?
(19) A. No.
(20) Q. Are you aware of any situation other than
(21) the situation with Atkinson where John Sommer
(22) threatened discipline or termination towards an
(23) employee if that employee spoke with Joseph
(24) Hazell?

**Page 170**

(1) A. No.
(2) Q. Do you have any involvement in setting
(3) compensation?
(4) A. No.
(5) Q. Do you know who does?
(6) A. We have a Compensation Department that
(7) gives ranges, but –
(8) Q. Do you have any understanding of the site
(9) manager bonus program?
(10) A. Vague understanding.
(11) Q. We'll get it from somebody who knows.
(12) Did it ever come to your attention
(13) that Joseph Hazell received a bonus from John
(14) Sommer after his termination?
(15) A. No. I mean, I heard that in the
(16) deposition so –
(17) Q. Other than what you heard in a deposition?
(18) A. Okay. Yeah. No, no.
(19) Q. Is Paul Miller still with the company?
(20) A. Yes.
(21) Q. He's still a CAE?
(22) A. Yes.
(23) Q. Is Jeff Schaffer still with the company?
(24) A. No.

**Page 171**

(1) Q. Do you know when he separated from
(2) employment?
(3) A. Within the last two months. I believe
(4) it's the last two months.
(5) Q. Do you know if his separation was
(6) voluntary or involuntary?
(7) A. Involuntary.
(8) Q. He was fired?
(9) A. Yes.
(10) Q. Why?
(11) A. There were issues with cash. They call
(12) them – I don't know all the exact lingo – but
(13) it's like error report that shows how much money
(14) was deposited versus how much was actually
(15) received. And if the two don't match, an error
(16) letter is generated saying there was some sort of
(17) discrepancy in the two. It's my understanding of
(18) the error letter.
(19) Q. It's your understanding that he received
(20) an error letter?
(21) A. Yes. Several error letters.
(22) Q. Several?
(23) A. Uh-huh.
(24) Q. Who was his CAE?

**Page 172**

(1) A. Paul Miller.
(2) Q. Do you have any idea once this error
(3) letter is generated where it goes first?
(4) A. No. I don't know where it goes first.
(5) Q. And because Mr. Schaffer received these
(6) error letters, he was fired? Or because the error
(7) letters were received for his site, he was fired?
(8) A. I think there was a piece of it. I mean,
(9) you don't get an error letter and then get
(10) terminated immediately. There's I guess look into
(11) exactly what it was, what it entailed, the
(12) timeframe, the duration.
(13) Q. Who does that investigation?
(14) A. The CAE.
(15) Q. Do you know if anything else was
(16) considered in the termination of Jeff Schaffer
(17) other than the error letters?
(18) A. I don't. That's the big one that sticks
(19) out. I don't recall if there were other pieces
(20) that – or piece of that decision.
(21) Q. How did you first meet Joseph Hazell?
(22) A. When did I first meet him?
(23) Q. Yes.
(24) A. I think it was the July site manager

**Page 173**

(1) quarterly meeting.
(2) Q. Who ran that meeting, like who was leading
(3) it?
(4) A. Steve VandenBrook.
(5) Q. How did you come to meet Joseph Hazell at
(6) that meeting?
(7) A. At the end of the meeting, he came up and
(8) introduced himself.
(9) Q. What did he say to you? He just said, Hi,
(10) I'm Joseph Hazell?
(11) A. Hi, I'm Joseph. Hi, how are you?
(12) Q. Okay.
(13) A. Then we started talking. Actually, I
(14) asked him about Arthur Smith to find out how
(15) Arthur was doing and whether or not he had
(16) attended CSR training class. And at that point, I
(17) believe Joseph had told me that no, he had not
(18) attended, but that he was getting him scheduled
(19) for the one that was the following week or within
(20) the next two weeks I think it was and that Joseph
(21) was going to take him there himself, actually
(22) personally, was going to drive him there. And
(23) then Joseph mentioned to me about – he said that
(24) Paul Miller needed sensitivity training.

**Page 174**

(1) Q. Anything else you recall?
(2) A. No, I don't. It was – oh, go ahead.
(3) Q. How long did the conversation last?
(4) A. Five to ten minutes. It wasn't very long.
(5) It was the end of the meeting and I was being
(6) pulled by a lot of different managers, were asking
(7) me, you know, Can I talk to you when you're done,
(8) can I talk you when you're done? So we were kind
(9) of walking as we were talking because, again,
(10) groups of people were around in different areas.
(11) We were in the lobby, I believe.
(12) Q. Did Joseph explain to you why he thought
(13) Miller needed sensitivity training?
(14) A. No. He did not give specifics.
(15) Q. He just made that statement?
(16) A. Yes. And I don't – yes. And I don't
(17) remember asking – I don't remember asking him
(18) what the specifics were. I already – in my mind,
(19) I already knew that Joseph – Arthur Smith had
(20) made some allegations and I knew that Arthur was
(21) working there, so I thought the two were kind of
(22) linked since we were talking about Arthur was the
(23) first part of the conversation.
(24) Q. What's your understanding of what Joseph

**EXHIBIT**

A

Page 175

(1) meant by sensitivity training?
(2) A. Just how he interacts with people. Soft
(3) skills I call them.
(4) Q. By sensitivity training or by anything
(5) that Mr. Hazell said, did you understand that he
(6) thought Mr. Miller had issues with regard to race?
(7) A. No.
(8) Q. And you didn't follow up with Mr. Hazell
(9) about the sensitivity training or why he thought
(10) Miller needed sensitivity training?
(11) A. No.
(12) Q. Did you ever tell Mr. Miller that
(13) Mr. Hazell indicated to you that Mr. Miller needed
(14) sensitivity training?
(15) A. I don't think I did. Actually, I did
(16) mention to I – I did not mention Joseph's name, but
(17) I did mention to Paul that there was another claim
(18) of being insensitive.
(19) Q. Do you know how long after the quarterly
(20) meeting that you mentioned this to Mr. Miller?
(21) A. If I'm not mistaken, I think it was within
(22) three or four days. There was a CAE meeting that
(23) was scheduled either that same week or the first
(24) of the following week.

Page 176

(1) Q. Do you recall what you said?
(2) A. No. I remember speaking more – I
(3) remember speaking to Paul. It was more so
(4) actually about Arthur Smith than anything else,
(5) not specifically Joseph, because I think Arthur
(6) had – I think the way I lumped it all together
(7) was that he needed to be careful about the
(8) perception that he was given.
(9) Q. That he was giving?
(10) A. That he was giving – excuse me – that he
(11) was giving. Because I remember in our rides, I
(12) had mentioned to Paul that he needed – that
(13) whenever he walked into a site, he needed to be
(14) sure to say hi to everybody, because sometimes
(15) that can be perceived as you're the big boss,
(16) you're just going in and talking to the manager
(17) and doing paperwork and that sort of thing, and
(18) that he should be – make sure he's friendly when
(19) he walks in the door.
(20) Q. Okay.
(21) A. I remember that piece of it.
(22) Q. Is there anything that Paul said to you
(23) when you told him that another issue had arisen,
(24) another claim of being insensitive? Did he make

Page 177

(1) any comments that you can recall?
(2) A. I mean we talked. He didn't think that he
(3) was insensitive in any way. He definitely didn't
(4) feel he was a racist, that he felt that he was
(5) fair – he treated all his employees the same. He
(6) was very adamant about the fact that he did not
(7) give any sort of preferential treatment to
(8) employees or anything to that nature.
(9) Q. Do you ever remember telling Miller that
(10) it was Mr. Hazell who had made that second –
(11) A. No.
(12) Q. – I don't want to call it a complaint,
(13) but the comment about sensitivity.
(14) A. Right. No, I don't remember telling him.
(15) Q. Did Arthur Smith make any other verbal
(16) complaints to you after the ones that we've
(17) already discussed?
(18) A. Yes.
(19) Q. About Mr. Miller or – and/or
(20) Mr. Schaffer?
(21) A. No, not about them.
(22) Q. What were Mr. Smith's other complaints
(23) that he made to you?
(24) A. Were in regards to Tim Ryan.

Page 178

(1) Q. Did Mr. Smith ever complain about
(2) Mr. Hazell?
(3) A. No.
(4) Q. What were his complaints about Mr. Ryan
(5) generally?
(6) A. Well, actually, Arthur had a Worker's Comp
(7) situation, also, and he was upset with Tim because
(8) he was arriving late to the site and –
(9) Q. Because Arthur was arriving late?
(10) A. Arthur was – he – yeah. Arthur was
(11) upset with Tim because Arthur was arriving late
(12) for his scheduled shift and Tim was disciplining
(13) him for arriving late.
(14) Q. Anything else that Arthur Smith complained
(15) of specifically that you can recall?
(16) A. It was in reference to his schedule. I
(17) mean he was upset with the scheduling and also the
(18) duties in which he was being asked to perform.
(19) Arthur felt that he was a lot person, and there is
(20) no such position as a lot person, crew, or
(21) anything to that nature. He would – Arthur
(22) complained that Tim would ask him to run the
(23) register, and Arthur did not feel that that was in
(24) his scope of responsibilities, which I explained

Page 179

(1) to him that it was.
(2) Q. Do you know if he ever did go through that
(3) formal CSR training?
(4) A. I don't believe he did.
(5) Q. He was ultimately fired?
(6) A. Yes, yeah, uh-huh.
(7) Q. By Tim Ryan?
(8) A. Yes.
(9) Q. Was his termination related to his being
(10) late for his shift?
(11) A. Yeah. Tardiness.
(12) Q. While you were speaking, I was flipping
(13) through defendants documents to see if there was a
(14) date on that quarterly meeting, and I don't see
(15) one. Do you remember what the date was?
(16) A. No, not off the top of my head. I
(17) remember seeing something, but am I able to like
(18) refer back to the deposition? I think it was July
(19) 24th. I remember seeing an agenda, but I may –
(20) Q. For that particular meeting?
(21) A. Yeah. I think that was it, at the
(22) Renaissance. That's where the – where I met
(23) Joseph was at the Renaissance. I think it was
(24) July 24th, but again I'm not –

Page 180

(1) Q. You're not sure?
(2) A. Yeah. I'm not sure.
(3) Q. Was that quarterly meeting just a one-day
(4) meeting?
(5) A. Yes.
(6) Q. And was it all day?
(7) A. Yeah.
(8) Q. Can you just tell me, if you look at the
(9) agenda that was produced by BP, it's titled
(10) Quarterly Review Meeting Agenda. There's actually
(11) a couple of documents here. One's a quarterly
(12) review meeting agenda, one is a second quarter
(13) site manager meeting, one's quarterly meeting
(14) review agenda which I think is the same document
(15) as the first. Looks like we just have two copies
(16) of the same thing because it looks like second
(17) quarter site manager meeting is the same as the
(18) second quarter site manager meeting. And that's
(19) it. But can you tell me, is there any way for you
(20) to tell me whether this was actually the agenda
(21) for that quarter meeting or not? I don't know
(22) that you can, but if you can.
(23) MR. ELLIS: You mean "that" meaning
(24) the one in July of 2001?

BSA          HAZELL v. BP PRODUCTS      STEVEN VANDENBROOK    12-16-02       XMAX(50/26)

Page 163

(1) Q. Okay.
(2) A. Because later I had asked John – this is
(3) well after the fact. It's really almost
(4) irrelevant to your question.
(5) Q. Well, then what is the conversation that
(6) you had with Mr. Sommer about the debris at the
(7) site that you were just referring to?
(8) A. When we were just talking through it, John
(9) did not have this territory for a great period of
(10) time. So when we were looking at it, I was
(11) looking at it and asking John what his impression
(12) was. I wanted to make sure that John was as
(13) alarmed by what he saw as I was.
(14) Q. Was he?
(15) A. Yes, he was.
(16) Q. You said sometime later you had a
(17) conversation with him about –
(18) A. How many times he sees a site, what his
(19) regularity is. I later had conversation
(20) determining his pattern in how many site visits he
(21) had, and I was trying to get a better feel later,
(22) had nothing to do with this topic at all, as to
(23) how many times he saw a site, with what
(24) regularity, what criteria did he use, what types

Page 164

(1) of issues would he have that would constitute the
(2) number of times he would see a site and things
(3) like that.
(4) Q. But that wasn't in relation to
(5) Mr. Hazell's termination?
(6) A. Correct.
(7) Q. That was just general practices for him as
(8) a CAE?
(9) A. Correct.
(10) Q. What did he say his pattern was? How
(11) often did he visit each of his sites?
(12) A. It depended on the type of issues he was
(13) having. If he had sites that were having larger
(14) cash and shrink variations and issues, he would
(15) try and see those sites at least once a week if
(16) not more. Sites where all the numbers were really
(17) good and everything, when he went on his last
(18) visit looked good, he'd probably see those sites
(19) bimonthly.
(20) Q. Now, the conversation that you had with
(21) Ms. Bertot while you were in the car prior to
(22) terminating Mr. Hazell, can you recall the subject
(23) of that – the subject matter that was discussed
(24) in that conversation?

Page 165

(1) A. Yeah. When I called Mikki to discuss what
(2) was found there, I talked to her about the gas
(3) price changes. I explained to her that when we
(4) arrived at the site, the prices on the ID signs
(5) had changed to reflect the prices that gas
(6) marketing had sent to the site. And I
(7) explained – do you want me to go through detail
(8) by detail?
(9) Q. Yes.
(10) A. Okay. Because basically I said a while
(11) ago is similar to – I kind of went step by step
(12) through with her what all my findings were.
(13) Q. So basically everything that you've
(14) described to me as to what you found that day, you
(15) discussed with Mikki Bertot?
(16) A. Yes.
(17) Q. Anything additional that you discussed
(18) with her that you didn't already indicate to me?
(19) A. I know in a conversation we talked a
(20) little bit about his action plan even though it
(21) was not a determining factor. And that really had
(22) nothing to do with the site visit itself. And we
(23) talked about the security issues with the password
(24) and allowing people to change the prices. We

Page 166

(1) talked about the safety of the people possibly
(2) getting hurt with the glass, the pricing issues.
(3) I know she had asked me why he left the site.
(4) Q. What did you say?
(5) A. I told her that he said he was sick, he
(6) left early sick. And then she asked me if I
(7) believed that, and I said I was not sure.
(8) Q. Okay.
(9) A. And after we discussed all the details of
(10) what we found that day, we both came to the
(11) conclusion that he should be separated.
(12) Q. You and Ms. Bertot?
(13) A. Correct.
(14) Q. So the conclusion was – the decision to
(15) terminate Mr. Hazell came as a joint discussion
(16) between you and Ms. Bertot?
(17) A. Correct. It really was not John's
(18) decision. It was more mine.
(19) Q. Did Ms. Bertot tell you that prior to
(20) August 13th an anonymous – actually a Michael
(21) Buggs had called BP Products and alleged that his
(22) daughter was sexually harassed by Mr. Hazell?
(23) A. I've never heard this person's name you
(24) just mentioned before.

Page 167

(1) Q. Did you ever learn that there were, prior
(2) to August 13st, did you learn that there was an
(3) allegation of harassment being made against
(4) Mr. Hazell?
(5) A. No. First I heard of it today.
(6) Q. So that did not enter into your thinking
(7) in any way, shape, or form on August 13th because
(8) you didn't know about it?
(9) A. I've never heard that before.
(10) Q. When you discussed the action plan, when
(11) you and Ms. Bertot discussed the action plan, what
(12) context were you discussing it in?
(13) A. Mikki had asked me if she knew about him
(14) being on an action plan previously.
(15) Q. If you knew about it?
(16) A. If I knew about it. And I told her yes, I
(17) was aware of it. And we discussed the content of
(18) it. And that was pretty much the action plan.
(19) The action plan, the cash handling issues, we
(20) didn't have a red book at the site to see, to
(21) verify if he was doing it or not because it wasn't
(22) there.
(23) Q. The cash reconciliations are done within
(24) the red book?

Page 168

(1) A. Cash, critical inventory counts, all
(2) that's done in the red book.
(3) Q. Okay.
(4) A. It also balances Lottery, Lotto. I don't
(5) know if the site had – I can't remember what the
(6) tokens are called.
(7) Q. Okay.
(8) A. But –
(9) Q. Did you know prior to August 13th, 2001,
(10) that Mr. Hazell had –
(11) A. Could I clarify one more thing?
(12) Q. Absolutely.
(13) A. I did think it was a very serious
(14) violation not to have the red book there
(15) incomplete, though, because that did come up in my
(16) conversation with Mikki.
(17) Q. Did you speak about that with Mr. Hazell
(18) prior to terminating him?
(19) A. Yeah. We asked him where it was.
(20) Q. What did he say?
(21) A. He didn't know. Or I think he said he
(22) left it at home or something. It wasn't at the
(23) site. I can't recall his exact answer, but I knew
(24) it wasn't at the site. And it was not complete.



EXHIBIT B

Page 169

(1) And I have not seen the red book complete yet or
(2) from that timeframe complete with – in his
(3) writing.
(4)    Q.    Did he return it at any time that you're
(5) aware of?
(6)    A.    I don't recall if it was in all the
(7) documentation.
(8)    Q.    Prior to the litigation, did you see it?
(9)    A.    I don't recall it being returned.
(10)    MR. ELLIS:    You returned it to us.
(11)    MS. CALO:    I returned it to you?
(12)    MR. ELLIS:    Yes. In the documents,
(13) that nine boxes of documents that you
(14) sent to us.
(15)    BY MS. CALO:
(16)    Q.    And you recall specifically discussing the
(17) red book with Joseph that day?
(18)    A.    I remember asking where it was. That was
(19) the discussion.
(20)    Q.    And he said he didn't know?
(21)    MR. ELLIS:    No.
(22)    THE WITNESS:    I think what he said
(23) is it wasn't at the site.
(24)    BY MS. CALO:

Page 170

(1)    Q.    Did you ask him where it was?
(2)    A.    Yes.
(3)    Q.    What was his response?
(4)    A.    I thought he said it was at home.
(5)    Q.    Did you tell him you wanted him to go get
(6) it and it bring it back?
(7)    A.    Right then and there, no. The other
(8) issues were still much more prominent than that
(9) issue at that time.
(10)    Q.    Did you know prior to August 13th, 2001,
(11) and that Hazell had – that Hazell and Bertot had
(12) a discussion about Paul Miller's need for
(13) sensitivity training?
(14)    A.    I think – I believe Mikki and I discussed
(15) it.
(16)    Q.    During that one-hour conversation, or at
(17) some other time?
(18)    A.    Prior.
(19)    Q.    Do you recall the content of that
(20) discussion at all?
(21)    A.    I know that Joseph had – I don't recall
(22) it in detail, but I'm sure if I saw whatever
(23) documentation there was from it, I'd have better
(24) recollection.

Page 171

(1)    Q.    There is none that I know of.
(2)    A.    Okay. I remember that Hazell had made a
(3) statement to Mikki. And I remember Mikki
(4) investigating it. And I do know that I had a
(5) separate conversation with Paul about sensitivity.
(6) And Mikki told me that she had a conversation with
(7) Paul on the topic.
(8)    Q.    When you had your conversation with Paul
(9) Miller about sensitivity, tell me what you recall
(10) about that conversation.
(11)    A.    I would prefer to just have a conversation
(12) with Mikki, a little recollection so I'm not –
(13) because I don't want to guess.
(14)    Q.    Well, you know, I'm sorry.
(15)    MR. ELLIS:    You can't talk to
(16) another witness to refresh your
(17) recollection.
(18)    THE WITNESS:    Then honestly off the
(19) top of my head, I don't recall.
(20)    BY MS. CALO:
(21)    Q.    You don't recall the conversation that you
(22) had with Paul Miller about sensitivity?
(23)    A.    I don't remember the complete content of
(24) the conversation.

Page 172

(1)    Q.    Do you remember any of it?
(2)    A.    I don't – I'm going to say for right now,
(3) I don't recall.
(4)    MR. ELLIS:    If you remember any –
(5)    THE WITNESS:    I don't want to
(6) guess.
(7)    MR. ELLIS:    Okay. Well, don't
(8) guess. But if you remember any of it,
(9) you should describe what you remember.
(10)    THE WITNESS:    If I knew, if I had
(11) recollection exactly what Joseph stated,
(12) then that would probably refresh my
(13) memory enough to know exactly what that
(14) conversation was.
(15)    BY MS. CALO:
(16)    Q.    Well, I would like to have something of
(17) that, too, but there's no documentation that I
(18) know of about what Joseph stated. So I can't give
(19) anything to you because I don't have it.
(20)    A.    Okay. I don't remember the content then.
(21)    Q.    Do you recall anything that you said to
(22) Paul Miller about this sensitivity issue? I don't
(23) want you to guess. I'm asking you for your
(24) recollection of things that you said to Paul

Page 173

(1) Miller about the issue of sensitivity.
(2)    A.    Again, I guess I'd like to give the same
(3) answer, that I don't recall.
(4)    Q.    Okay. Do you have any recollection of
(5) telling Paul Miller that it was Joseph Hazell who
(6) raised the issue?
(7)    A.    I never would have told him that.
(8)    Q.    Do you recall that you didn't? You're
(9) saying you never would have told him that. Do you
(10) have a specific recollection that you did not say
(11) Joseph Hazell?
(12)    A.    If – I know my habits and I know how I've
(13) been trained. And under no circumstance would I
(14) have – if an employee makes a confidential
(15) statement to myself or HR, under no circumstance
(16) should I use that individual's name or situation
(17) unless the employee has – is okay with – if it's
(18) general enough to where they're not going to know,
(19) then we might use the situation. Under no
(20) circumstance would the name of a person making a
(21) statement, a confidential statement, be made to
(22) the person they're complaining about. I mean you
(23) just never, ever do that.
(24)    Q.    Fair enough. You said that you recall

Page 174

(1) that Mikki investigated that statement?
(2)    A.    I remember – I remember Joseph had made a
(3) comment to me, and I don't recall exactly what it
(4) was, and Mikki had tried to investigate it, yes.
(5)    Q.    Did you personally ever follow up with
(6) Joseph Hazell about why he made the statement or
(7) the circumstances behind him making the statement
(8) or anything of that nature?
(9)    A.    No.
(10)    Q.    Did you have any information that anyone
(11) else followed up with Joseph Hazell about that
(12) statement?
(13)    A.    I think – I'd have to – this situation
(14) honestly I never thought would come back, so my
(15) recollection of it, I'm thinking that Mikki would
(16) have discussed it with him, but I don't know that
(17) for sure.
(18)    Q.    In the way that your understanding of how
(19) situations like this are handled, okay, would you
(20) expect that HR would follow up with the person
(21) making the statement that somebody else needed
(22) sensitivity training?
(23)    A.    If an employee makes an anonymous
(24) statement, then there's no way they could. But if

## Page 175

(1) the employee clearly was identified, then HR
(2) should have gone back and had some discussion
(3) around resolution. Some of that resolution, they
(4) cannot tell the employee what it is.
(5)  Q.   So after you got off the telephone –
(6) anything else that you discussed with Mikki Bertot
(7) during that one-hour conversation on October –
(8) I'm sorry – on August 13th, 2001, you and I have
(9) not already talked about?
(10)  A.   I don't think so, no.
(11)  Q.   Nothing else that you recall?
(12)  A.   No.
(13)  Q.   And then after that conversation, do you
(14) again speak with John Sommer alone outside the
(15) presence of Mr. Hazell?
(16)  A.   Yes.
(17)  Q.   And how long is the conversation with John
(18) Sommer?
(19)  A.   Less than a minute.
(20)  Q.   And at that point, what do you tell him?
(21)  A.   I told him we are going to terminate him.
(22)  Q.   Where is Mr. Hazell? When you decide
(23) you're going to terminate him, where do you find
(24) him?

## Page 176

(1)  A.   Honestly, I don't know. I don't know
(2) where he was when I had that discussion with John.
(3)  Q.   Okay.
(4)  A.   I remember – because your next question
(5) is going to be where that discussion was, right?
(6)  Q.   Right.
(7)  A.   I remember the three of us standing in the
(8) front of the site.
(9)  Q.   Meaning outside or inside?
(10)  A.   Outside the site, between the price sign
(11) and the building. We were standing between the
(12) two. And I remember John saying to Joseph, At
(13) this point I'm going to need your keys back and
(14) we're going to let you go.
(15)  Q.   Did Mr. Hazell say anything?
(16)  A.   I think he was begging for a second
(17) chance.
(18)  Q.   Yeah.
(19)  A.   And that he was asking for, you know, to
(20) recant his statement again.
(21)  Q.   He was asking if he could take back the
(22) statements he had made previously?
(23)  A.   Yes. And he asked again for a second
(24) chance on that, and we basically told him at this

## Page 177

(1) point, there's no reason to continue the
(2) conversation.
(3)  Q.   Okay. And that's it?
(4)  A.   Pretty much he gave him the keys and left.
(5)  Q.   Did you ask him to bring anything back to
(6) the store or back to the site or any other
(7) conversations about things that he may have had in
(8) his own possession at home or –
(9)  A.   John and I did not know that Joseph had
(10) all that stuff at his house.
(11)  Q.   Did you know he had anything at his house?
(12)  A.   I knew the red book wasn't there.
(13)  Q.   Okay. After terminating him –
(14)  MR. ELLIS:   Wasn't at his house or
(15) at the station?
(16)  THE WITNESS:   It wasn't at the
(17) site. I didn't know where all this
(18) material was at.
(19)  BY MS. CALO:
(20)  Q.   After terminating him, did you tell him he
(21) should return anything that he had or any
(22) conversation about returning company property?
(23)  A.   I did not – I did not specifically ask
(24) that.

## Page 178

(1)  Q.   Do you know if BP contested Mr. Hazell's
(2) claim for unemployment compensation?
(3)  A.   I do not know.
(4)  Q.   Did you have another conversation with
(5) Ms. Bertot that day regarding Mr. Hazell?
(6)  A.   I mean I'd go back to my earlier answer
(7) and say I'm not sure.
(8)  Q.   You're not sure if you did or not, you
(9) don't recollect sitting here today that you did?
(10)  A.   I don't recall one way or the other.
(11)  Q.   Were you asked any time to write up, make
(12) a written statement of what happened that day with
(13) Mr. Hazell?
(14)  A.   No.
(15)  Q.   Did you at any point sit down and write up
(16) what happened with Mr. Hazell? And the caveat to
(17) that is I'm not asking you for any communications
(18) that you had with counsel.
(19)  A.   No.
(20)  Q.   To refresh your own recollection, once you
(21) learned about the charge, for example, did you sit
(22) down and write down some events?
(23)  A.   No.
(24)  Q.   How did you learn that Mr. Hazell had

## Page 179

(1) filed a charge of discrimination?
(2)  A.   Mikki told me.
(3)  Q.   And how long was that conversation?
(4)  A.   It was very short.
(5)  Q.   Outside the presence of counsel, did you
(6) have any conversations with John Sommer about the
(7) charge of discrimination?
(8)  A.   Did we ever –
(9)  Q.   Talk about it?
(10)  A.   We probably did.
(11)  Q.   And did you outside the presence of
(12) counsel go over what you remembered happening and
(13) what he remembered happening?
(14)  A.   No. I asked John Sommer – after the
(15) incident happened, I asked John Sommer to write a
(16) statement summarizing what happened. I actually
(17) did ask him to. I told him to.
(18)  Q.   You told him to write up a statement of
(19) what happened?
(20)  A.   Yes. Summary of that day. After the
(21) incident, I told John to write a summary.
(22)  Q.   How long after August 13th do you think
(23) you told him to do that?
(24)  A.   I told him that day.

## Page 180

(1)  Q.   Oh, that day you told him to?
(2)  A.   Right.
(3)  Q.   Did you ever receive that statement?
(4)  A.   I didn't ask him for a copy, but I told
(5) him to write it up and send it in with his file to
(6) HR.
(7)  Q.   Do you know whether he did that or not?
(8)  A.   I later saw a copy of it.
(9)  Q.   What you saw –
(10)  MS. CALO:   Well, can you show you
(11) him Bertot-9, please?
(12)  MR. ELLIS:   (Tenders document.)
(13)  BY MS. CALO:
(14)  Q.   My question to you, is this what you saw?
(15)  MR. ELLIS:   That's Exhibit
(16) Bertot-9.
(17)  THE WITNESS:   Could you repeat the
(18) question now?
(19)  BY MS. CALO:
(20)  Q.   Is this the statement that you saw?
(21)  A.   Yes.
(22)  Q.   When you saw it, was it in e-mail form or
(23) was it in some other form?
(24)  A.   I thought it was in written form.



LAW OFFICES

# GALLAGHER, SCHOENFELD, SURKIN & CHUPEIN
### A PROFESSIONAL CORPORATION

ALEXANDER A. DiSANTI
*Counsel to the Firm*

JOHN M. GALLAGHER‡
RONALD H. SURKIN
LYN B. SCHOENFELD*
JOSEPH W. CHUPEIN, JR.
NANCY C. DeMIS+
DENA B. CALO+
MANDY C. ROSENBLUM▴

‡ BOARD CERTIFIED CIVIL
   TRIAL SPECIALIST
* LL.M. IN TAXATION
+ PA AND NJ BARS
▴ PA, DC AND MD BARS

25 WEST SECOND STREET
MEDIA, PENNSYLVANIA 19063
—
TELEPHONE: (610) 565-4600
FACSIMILE: (610) 566-8257
—
REPLY TO P.O. BOX 900
MEDIA, PENNSYLVANIA 19063
EMAIL: dbc@gssclaw.com

January 6, 2003

Ms. Joan D. Gmitter
Charge Receipt Supervisor
Equal Employment Opportunity Commission
The Bourse Building
21 S. Fifth Street
Philadelphia, PA 19106-2515

    **Re:**   *Joseph S. Hazel v. BP Amoco*

Dear Ms. Gmitter:

    Enclosed for filing is a charge of discrimination against the above-referenced employer.

    We are requesting that the EEOC issue an immediate right to sue in this matter, based on the fact Mr. Hazel filed a federal lawsuit against BP Amoco on May 14, 2002, and litigation is progressing.

    Enclosed is a copy of this letter to be time-stamped and returned to me in the self-addressed, stamped envelope provided, so that I may have a record of filing

    Thank you for your prompt attention.

             Very truly yours,

             DENA B. CALO

DBC:alc
Enclosure

cc:    Mr. Joseph S. Hazell (w/enc.)



**EXHIBIT**

C

 **bp** 

## Mary L. Casey
Attorney
BP Legal

BP America Inc.
200 East Randolph Drive
Mail Code 2101A
Chicago, Illinois 60601

Direct: 312-856-6656
Fax: 312-616-0875
caseyml@bp.com



<u>**Via UPS Next Day Air**</u>

January 24, 2002

Alfred L. Harris
Enforcement Manager
Equal Employment Opportunity Commission
Philadelphia District Office
21 South Fifth Street
Suite 400
Philadelphia, PA 19106-2515

**Joseph S. Hazell v. BP Amoco**
**Charge No. 170A200255**

Dear Mr. Harris:

Respondent, BP Products North America Inc.[1] ("BP") hereby submits its statement of position (incorporating your agency's Request for Information) in response to Charging Party Joseph Hazell's charge of race, color and national origin discrimination.[2] BP denies that it terminated Mr. Hazell on the basis of any of the alleged grounds. Instead, Mr. Hazell was terminated for violating BP's strict procedures regarding gasoline pricing and failing to notify his supervisor that he was leaving the station. Accordingly, his charge is without merit.

## BACKGROUND

BP hired Mr. Hazell on January 22, 2001, as a Site Manager ("SM") at one of its combination convenience store/gas stations in the Philadelphia market. These locations dispense gasoline products and sell various convenience products such as grocery items, soda, cigarettes, and light snacks. As a SM, Mr. Hazell was responsible for the overall successful operation of the station, including conducting competitor pricing surveys, achieving gasoline sales targets, operating

---

[1]   Mr. Hazell's employer was Amoco Oil Company. The Company was renamed on October 1, 2001 as BP Products North America Inc., which is the proper name of the Respondent in this matter.
[2]   The statement of facts and position set forth herein is based upon the undersigned's understanding and investigation of the facts at the time this statement of position was prepared. By submitting this statement of position, BP in no way waives its rights to present new or additional facts or arguments based upon subsequently acquired information or evidence. Further, this statement of position, while believed to be true and correct in all respects, does not constitute an affidavit and is not intended to be used as evidence in any administrative or court proceeding of any kind. Lastly, by responding herein, BP waives none of its defenses and reserves all rights and contentions even if not mentioned herein.



EXHIBIT
D

Alfred L. Harris
January 24, 2002
Page 2

profitable C-store and car wash sales, controlling inventories and expenses, and providing a clean, safe environment for both employees and customers. See Exhibit A.

When Mr. Hazell was hired, he trained at station No. 4518 in the Philadelphia market until he was assigned in May 2001 to station No. 4493 located at 2200 Island Avenue; at that time he reported to the Philadelphia East market Customer Account Executive ("CAE") Paul Miller (White). In June 2001, BP reorganized its entire Philadelphia market so that on or about July 16, 2001, Mr. Hazell's station (No. 4493) became part of the Philadelphia West market, reporting to CAE John Sommer (White). While Mr. Hazell may have experienced several changes in his reporting relationships during his employment, so did other SMs in the Philadelphia markets—of all races.

## BP'S PRICING PROCEDURES

Significantly, when Mr. Sommer became the CAE for the Philadelphia West market, he met individually with all of his SMs, including Mr. Hazell, and reviewed the duties expected of them. Mr. Sommer specifically reviewed BP's pricing procedures and the importance of complying with them. He reminded his SMs that pricing was ultimately their responsibility and that if any SM deviated from BP procedures, termination would occur. Pricing is important for obvious business reasons. Financial loss could result if the signs at a station register higher gas prices than at the pumps, because customers would undoubtedly fail to purchase gasoline if they thought the advertised prices were too high. Conversely, customer dissatisfaction and confusion would clearly occur if the price on the signs were lower than the pump price. For these reasons, BP tolerates no errors with respect to its pricing practices and any SM who fails to adhere to the requirements will be subject to termination.

BP's gasoline pricing procedure requires a SM to drive a predetermined route on a daily basis (except Sunday) in order to gather information about competitors' prices. The SM must enter those prices in BP's computer system by 8:00 a.m. on each day with a confidential code assigned to the SM; the information is then transmitted to BP's pricing department for analysis. The pricing department then relays the gasoline prices that are to be programmed at the pumps and changed on the pricing signs[3] no later than noon that day. The price change at the pump is only to be performed by a SM and Mr. Hazell was well aware of that.

## EVENTS LEADING UP TO MR. HAZELL'S TERMINATION

By way of background, before Mr. Hazell began reporting to Mr. Sommer in mid-July of 2001, Mr. Miller (then his CAE) had placed Mr. Hazell on an Action Plan/Written Warning for a number of performance issues, particularly his failure to control shortages at the site. See Exhibit B. Although BP tolerates cash losses up to 1.5% of sales, Mr. Hazell had been experiencing losses in the range of 4.2% which was clearly unacceptable. Even so, when Mr. Sommer took over as CAE in mid-July, he gave Mr. Hazell a fresh start and removed him from

---

[3]  A Customer Service Representative ("CSR") may, if agreed to by the SM, change the gas prices on the price signs and above the pumps, but **cannot** implement a price change at the pumps.

Alfred L. Harris
January 24, 2002
Page 3

the Action Plan. This scarcely suggests that Mr. Sommer was motivated to discriminate against Mr. Hazell on any of the alleged bases. However, Mr. Hazell persisted in displaying many of the same problems that had been outlined in the Action Plan, including his back office organization, daily paperwork and his cash shortages, about which Mr. Hazell was verbally counseled.

Then, on August 13, 2001, when Mr. Sommer and Operations Manager, Steve Vandenbrook, were riding in Mr. Sommer's territory and performing routine site inspections, they stopped at Mr. Hazell's station in the early afternoon. At that time, Mr. Sommer and Mr. Vandenbrook noticed Customer Service Representative ("CSR") Arthur Smith manually changing the gas prices on the price sign and above the pumps. Mr. Smith approached Mr. Sommer and Mr. Vandenbrook as they were getting out of the car and told them that he did not have enough numbers to place above the pumps.[4] When Mr. Sommer asked where Mr. Hazell was, Mr. Smith replied that he had left early due to illness. At that point, Mr. Sommer learned that the new pricing on the pumps had not been implemented because the prices on the pumps ($1.45 Blue, $1.55 Silver and $1.65 Gold) did not match the prices on the signs ($1.46 Blue, $1.56 Silver and $1.66 Gold)[5]. Both Mr. Vandenbrook and Mr. Sommer were concerned about this discrepancy because customers would understandably be confused by the different prices displayed on the signs as opposed to the pumps. Customers might not purchase gasoline at the site, thinking that the prices were too high based upon the signs. Mr. Sommer and Mr. Vandenbrook also noticed that the station was strewn with trash and that the CSR and Assistant Manager were not in full uniform, which could further dissuade customers from making purchases at the location.

Mr. Sommer then telephoned Mr. Hazell at his home in order to obtain an explanation. Mr. Hazell informed Mr. Sommer that because he was not feeling well, he had asked Assistant Manager, Yasmeen Mosley, to implement the price change. Mr. Sommer reminded Mr. Hazell that he was solely responsible for programming the prices at the pumps and that an Assistant Manager was not authorized to do so. Mr. Hazell then agreed to come to the station to complete the price change.

When Mr. Hazell arrived at the station, Mr. Sommer and Mr. Vandenbrook met with him to discuss his failure to implement the price change at the pumps, his leaving the station without notifying the CAE (which is required), the fact that the CSR and Assistant Manager were not in full uniform, and the trashy appearance of the site. Mr. Hazell acknowledged that he should have notified Mr. Sommer of his absence. When asked why the prices at the pumps had not been changed, Mr. Hazell initially claimed he had changed the prices. But when Mr. Sommer pointed out that the price change had not been implemented at the pumps, Mr. Hazell was forced to admit that he failed to do so. Given the nature and number of his infractions, Mr. Hazell was informed that he was being terminated, with Mr. Vandenbrook's concurrence, effective August 13, 2001. See Exhibit C.

---

[4] All SMs are told if they run out of numbers for pricing, they are to purchase numbers from any store such as Home Depot, so that pricing can be accomplished. Therefore, there is no reason for a station to run out of numbers.
[5] Although a penny difference may not seem all that significant, the retail gasoline business operates on very small margins and such a difference can be of critical importance to a customer.

Alfred L. Harris
January 24, 2002
Page 4

## MR. HAZELL'S RACE, COLOR AND NATIONAL ORIGIN CLAIMS LACK MERIT

Mr. Hazell's allegations that his termination was based solely on his race, color and national origin are simply not true. It should be readily apparent that Mr. Hazell was terminated for failing to implement the required price changes, in violation of BP's procedures. Moreover, he had failed to clear his absence from the site with his CAE; the site had trash strewn about it; and CSR and Assistant Manager were not in full uniform. These are legitimate, non-discriminatory reasons to support a termination decision. Mr. Hazell also had performance issues with more than one CAE, which refutes his self-serving assertion that he was a successful SM. While it is true that the station itself was profitable during Mr. Hazell's tenure as SM, that fact cannot overcome his failure to follow basic pricing procedures and his commission of other infractions.

In addition, because BP does not maintain records on its employees' national origin, it is inconceivable that Mr. Hazell's termination had anything to do with his national origin. Pure and simple, he violated several basic job requirements. Similarly, Mr. Hazell's blanket allegation that BP systematically terminates Black SMs and replaces them with Whites is unfounded in the absence of any specific examples. In point of fact, as best as can be determined, for the years 2000 and 2001, four White SMs were replaced by other Whites; one Black SM was replaced by a White; three White SMs were replaced by three Blacks; two Black SMs were replaced by two Blacks; and one Hispanic SM was replaced by a White in the Philadelphia market. These facts refute Mr. Hazell's claim that BP systematically terminates Black Site Managers and replaces them with White Site Managers. In addition, BP is not aware of any non-Blacks that have violated BP's pricing policy without penalty. In short, Mr. Hazell's assertions are unsupported by any credible facts.

The only comparable termination situation involving another Black SM actually establishes that BP treats employees of all races fairly and will reverse a termination decision where warranted. Mr. Sommer initially terminated a SM (Calvin Howard, Black) for allegedly violating pricing procedures by having a third shift CSR input the price survey the following morning and upload the prices to the pricing department; the SM had also supposedly allowed his girlfriend to work at the site and brought a dog to the store. See Exhibit D. However, Mr. Howard was reinstated with back pay on or about December 10, 2001, after BP's Human Resources Department reviewed the matter and concluded that Mr. Howard should be reinstated because there was no conclusive evidence that he violated pricing procedures, nor had he allowed his girlfriend (a non-employee) to work at the site.[6] When Mr. Hazell's termination was reviewed by Human Resources, it was determined that there were no similar mitigating factors to warrant a reversal of the termination decision. Moreover, Mr. Hazell admitted that he had not implemented the required price change at the pumps, a clear violation of procedures. Accordingly, there were no compelling reasons to overturn the decision to terminate Mr. Hazell's employment.

---

[6] Mr. Howard admitted having a puppy at the site for no more than an hour on one occasion. This was not deemed a serious enough infraction, in and of itself, to warrant termination.

Alfred L. Harris
January 24, 2002
Page 5

## CONCLUSION

In sum, BP had adequate and non-discriminatory reasons for terminating Mr. Hazell, having nothing whatsoever to do with his race, color or national origin.  Accordingly, BP respectfully requests that your Agency dismiss Mr. Hazell' charge of discrimination in its entirety as being without merit.

Very truly yours,

Mary L. Casey

MLC/MKW/gb

Enclosures

# Site Manager

| | |
|---|---|
| **Supervisor:** *Company Account Executive* | **Competency Level:** 4 |
| **Status:** *Exempt/Salaried* | **Level:** *Retail J* |

## Position Summary:

This retail management position provides the opportunity to be fully accountable for the successful operation of one or more retail sites including gasoline, convenience store and car wash businesses. The Retail Site Manager focuses on achieving gasoline sales targets, C-store and car wash sales, controlling inventories and expenses, and providing a clean, safe environment for employees and customers. Split Second and BP Express managers have the added responsibility of operating a high volume deli business with corresponding food service and food handling responsibilities. Almost all of BP Amoco's company-owned stores are open 24 hours a day, seven days a week. Retail Site Managers typically work a 6 day week and are on call at all times.

## Position Competencies:

*Technical and Operational Expertise:* Ability to manage expense in areas of responsibility; ability to manage vendors. *Communication:* Listens to others and ensures that discussions are effective and constructive *Learning Ability:* Learns new skills and knowledge beyond discipline. *Leadership and Guidance:* Provides leadership and guidance to work group or team members; plans tasks and time; prioritizes, follows up and ensures completion of tasks. *Customer Responsiveness:* Establishes and maintains outstanding customer service standards; possesses solid product knowledge. *Problem Solving:* Identifies and implements appropriate solutions in area of responsibility; properly applies all policies relevant to situation. *Decision Making:* Participates in setting site objectives; analyzes options and looks at implications. *Personal Effectiveness:* Shifts gears comfortably; demonstrates tolerance with people and process; displays an entrepreneurial quality. *Embracing Change:* Willing to identify improvement and lead change; can decide and act without having the total picture.

- Ensuring the highest level of customer service and satisfaction;
- Executing marketing and sales strategies; and plans;
- Managing monthly operating budgets and business costs;
- Providing leadership and coaching to Customer Service Representatives (CSRs);
- Conducting competitor pricing surveys;
- Recruiting and hiring of hourly staff;
- CSR staff scheduling, training, development and performance assessment; an.
- Ensuring each facility operates to its fullest potential consistent with BP Amoco's standards.

## Qualifications

Qualifications for the Site Manager position include two to four years of experience managing any type of retail business or two to four years in the military, either of which involved supervision of large numbers of employees. P&L/budget management responsibilities and inventory control management. Experience with a 24 hour/7 day operation and experience in recruiting, training, and motivating employees strongly preferred. In addition, both experience in food service and a bachelor's degree are highly desired but not required. Ability to provide excellent customer service, maintain a team environment and promote safety in the workplace are also desired.

## Benefits Include.

Competitive pay, hands on and school training, medical, dental and vision coverage, life insurance, paid vacation, paid holidays, and tuition reimbursement.

## How to Learn More

To apply, please fax your resume to 770-576-3055
or E-mail to : ThompsJ5@bp.com. BP Amoco is an equal opportunity employer.

Exhibit A



# *Site Manager*

| | |
|---|---|
| Supervisor: *Company Account Executive* | Competency Level: 4 |
| Status: *Exempt/Salaried* | Level: *Retail J* |

## *Benefits Include:*

Competitive pay, medical, dental and vision coverage, life insurance, 401K Plan, Non-Contributory retirement plan, paid vacation, paid holidays, and tuition reimbursement.

## *How to Learn More:*

To apply, please fax your resume to (253) 423-4248 or E-mail to: wolfet@bp.com. BP Amoco is an equal opportunity employer.





# bp

July 2, 2001

Joseph Hazeil
Site 4493

Re: Performance Action Plan/Written Warning

On June 26, 2001 I was notified by Accenture of excessive cash shortages at your location. The amount of the shortages was $1544.00. The period covers the time for which you directly supervised the site June 1 to June 26.. As you are aware, the ABU policy for cash allows for only a .5% of sales loss for inventory.

During a site visit, it was determined that none of the shift sheets were being reconciled daily. In addition, the following items were not being completed as required: cash variation scorecard for all employees. Your performance level in these areas is unacceptable and must be corrected immediately.

To assist you with improving your performance in the identified areas, you are being placed on a 60 day Performance Action Plan effective July 2. While on this action plan, I will meet with you every other week to assess and discuss your progression. Failure to improve your performance and meet the results of the action plan will result in further disciplinary action up to and including termination.

| Performance Issue | Expected Performance Level | Actions to take for Improvement | Date Actions to be Completed |
|---|---|---|---|
| Cash losses 4.2% of sales. | Cash losses not to exceed .5% of sales (excluding lottery/lotto and gas) | • Ensure all employees have their own PIN numbers to the safe and POS<br>• Reconcile critical inventory sheets on a daily basis<br>• Utilize a cash variation scorecard for every employee monthly. Fill out daily.<br>• Write up any employee over a $5.00 cash variation.<br>• Terminate any employee with cash variation over $25.00<br>• All new employees must have a training PIN number<br>• Do 2 cash audits per every shift throughout the month | July 2, 2001<br><br><br><br><br><br><br><br><br><br>August 2, 2001 |

Exhibit B



As previously stated, I will continually review and assess your performance over the next 60 days and will formally meet with you every other week, to discuss your progress based on the above Performance Action Plan. In addition, every month during the month I will receive updates from Accenture on you MTD cash variation. Once I receive this, we will review your results, assess your performance and take appropriate actions.

I fully expect that your performance will improve over the next 60 days and will remain consistent or exceed expectations in the future.  If you have any concerns during the next 60 days, please feel free to contact me directly to discuss.

Sincerely,

Paul C. Miller
Company Account Executive – Philadelphia East

Please sign below to acknowledge your receipt and understanding of this Performance Action Plan.

_____     _____
Employee's Signature                              7/3/2001  Date

EEOC Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Joseph Hazell
707 Yeadon Avenue
Yeadon, PA 19050-3513

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

[    ] *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170A300582 | Legal Unit | (215) 440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[    ]   More than 180 days have passed since the filing of this charge.

[ X ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]   The EEOC is terminating its processing of this charge.

[    ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[    ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[    ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Marie M. Tomasso, District Director

February 6, 2003
*(Date Mailed)*

Enclosure(s)

cc:   BP Amoco
Dena B. Calo, Esquire (For Charging Party)

**EXHIBIT**

E